**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:15-cv-00615

ROCKY MOUNTAIN WILD,
CENTER FOR BIOLOGICAL DIVERSITY,
UTAH NATIVE PLANT SOCIETY,
SOUTHERN UTAH WILDERNESS ALLIANCE,
GRAND CANYON TRUST,
WESTERN RESOURCE ADVOCATES, and
WESTERN WATERSHEDS PROJECT,

        Plaintiffs,

v.

NOREEN WALSH, in her official capacity as
Regional Director of the Mountain-Prairie
Region of the U.S. Fish and Wildlife Service,
SALLY JEWELL, in her official capacity
as Secretary of the Interior,
U.S. FISH AND WILDLIFE SERVICE, and
U.S. DEPARTMENT OF THE INTERIOR,

        Defendants.

---

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

---

**INTRODUCTION**

1.     This case challenges the U.S. Fish and Wildlife Service's (FWS) August 2014 decision not to protect Graham's beardtongue (*Penstemon grahamii*) and White River beardtongue (*P. scariosus var. albifluvis*), depicted below, as threatened or endangered species under the Endangered Species Act (ESA).  79 Fed. Reg. 46,042 (Aug. 6, 2014).

 

Graham's beardtongue
*Photo taken by Susan Meyer*

White River beardtongue
*Photo taken by Jessi Brunson, FWS*

2.      Graham's and White River beardtongues, also called penstemons, are rare wildflowers that live in the Uinta Basin of northwestern Colorado and northeastern Utah.  The beardtongues live almost exclusively in areas targeted for unconventional oil shale and tar sands mining and traditional oil and gas drilling.  Energy development, along with livestock grazing and trampling, small population size, invasive weeds, and climate change, threaten the beardtongues with extinction.

3.      This Court previously overturned FWS's 2007 decision not to list Graham's beardtongue as a threatened or endangered species under the ESA.  <u>Ctr. for Native Ecosystems v. Salazar</u>, 795 F. Supp. 2d 1199 (D. Colo. 2011).  The Court held that FWS failed to consider the best available science on threats and improperly relied on speculative, future conservation measures to protect the beardtongue.

4.      Although FWS proposed in 2013 to list as threatened Graham's beardtongue as well as White River beardtongue — which has an overlapping range and suffers from the same

threats — FWS reversed course in 2014 and decided not to list either species.  79 Fed. Reg. at 46,042.  This decision suffers from many of the same legal flaws this Court identified in 2011.

5.      FWS based its withdrawal decision on a Conservation Agreement that it developed with local counties, state and federal agencies, and the energy industry.  The Conservation Agreement relies on speculative, future conservation measures that, even if implemented, will provide insufficient protection to only a fraction of the beardtongue habitat that FWS has determined to be essential to the conservation of the species.

6.      The Conservation Agreement is not based on the best available science.  For example, FWS recognized oil shale mining as a threat to the beardtongues in large part because of the substantial number of beardtongue plants living on state and private lands where such mining is planned.  However, under pressure from the State of Utah, Uintah County, and the oil shale industry, FWS acquiesced to a 15-year Conservation Agreement that includes no protections for beardtongues on the lands most likely to be mined in the next 15 years.

7.      Plaintiffs seek a declaration that FWS's decision to withdraw the proposed rules violates the ESA, 16 U.S.C. § 1533, and the Administrative Procedure Act (APA), 5 U.S.C. § 706, and injunctive relief reinstating the proposed rules and ordering FWS to make a new final listing decision for the beardtongues.

## JUSRIDICTION AND VENUE

8.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question) and 16 U.S.C. § 1540(c), (g) (ESA citizen suits).

9.      Plaintiffs provided written notice of the legal violations alleged in this Complaint to FWS more than 60 days ago, as required by the ESA. <u>See</u> 16 U.S.C. § 1540(g)(2)(c). FWS has not corrected its violations of law.

10.     This Court has authority to grant Plaintiffs' requested relief pursuant to the ESA, 16 U.S.C. § 1540(g), the APA, 5 U.S.C. § 706, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02.

11.     Venue is properly vested in this Court pursuant to 16 U.S.C. § 1540(g)(3)(A) and 28 U.S.C. § 1391(e). Graham's and White River beardtongues and their habitats are found within this judicial district. Federal Defendant Noreen Walsh and several Plaintiffs also reside within this judicial district.

**PARTIES**

12.     Plaintiff ROCKY MOUNTAIN WILD is a nonprofit organization located in Denver, Colorado, dedicated to the conservation and recovery of native species and ecosystems across Utah, Colorado, and Wyoming. Rocky Mountain Wild began work on behalf of Graham's beardtongue in 2002 when it filed an ESA listing petition for the species, and has been a plaintiff in prior lawsuits challenging FWS's failure to list Graham's beardtongue. Rocky Mountain Wild also has engaged in a variety of other efforts to protect Graham's and White River beardtongue habitat, such as advocating for protections in federal resource management plans (RMPs), Master Leasing Plans, and site-specific permitting decisions affecting the species. Rocky Mountain Wild is involved in collaborative processes, like the Uinta Basin Rare Plant Forum and the Colorado Rare Plant Initiative, that work for conservation of Graham's and White River beardtongues.

13.     Plaintiff CENTER FOR BIOLOGICAL DIVERSITY (Center) is a nonprofit organization dedicated to the preservation, protection, and restoration of biodiversity, native species, and ecosystems.  The Center was founded in 1989 and is based in Tucson, Arizona, with offices throughout the country, including Denver, Colorado, and has more than 50,000 members throughout the United States and the world.  The Center petitioned FWS to list Graham's and White River beardtongues as endangered in 2004 and sued FWS in 2006 for failing to act on the petition.  The Center and FWS reached a settlement in 2011, with FWS agreeing to make listing decisions for White River beardtongue and other candidate species.

14.     Plaintiff UTAH NATIVE PLANT SOCIETY (UNPS) is a thirty-six year old nonprofit organization based in Salt Lake City, Utah, with chapters throughout the state.  UNPS is dedicated to the appreciation, preservation, and conservation of native plants and plant communities found in Utah and the Intermountain West.  UNPS has worked on behalf of Graham's and White River beardtongues for the last thirty-five years, recommending to FWS that the species be listed under the ESA as early as 1980.  The organization also has worked to preserve Graham's beardtongue seeds and to encourage research into its horticultural requirements.  UNPS members, staff, and board members have extensively studied, surveyed, and mapped Graham's and White River beardtongues, in collaboration with other organizations and agencies.

15.     Plaintiff SOUTHERN UTAH WILDERNESS ALLIANCE (SUWA) is a nonprofit organization based in Salt Lake City, Utah with more than 15,000 members nationwide.  SUWA is dedicated to the preservation of the outstanding wilderness in the heart of the Colorado Plateau and the management of these lands in their natural state for the benefit of

all Americans.  SUWA has advocated for the protection of Graham's beardtongue for nearly two

decades by petitioning and litigating for its listing under the ESA.  Moreover, SUWA has long

fought to protect lands containing Graham's and White River beardtongue habitat from

development.

16.     Plaintiff GRAND CANYON TRUST (Trust) is a nonprofit organization

headquartered in Flagstaff, Arizona, with offices in Durango and Denver, Colorado, and Moab

and Salt Lake City, Utah.  The Trust has approximately 4,000 members, many of whom reside in

Colorado and Utah.  The Trust's mission is to protect and restore the Colorado Plateau — its

spectacular landscapes, flowing rivers, clean air, diversity of plants and animals, and areas of

beauty and solitude.  One of the Trust's goals is to ensure that the Colorado Plateau is a region

characterized by vast open spaces with restored, healthy ecosystems, and habitat for all native

fish, animals, and plants, including Graham's and White River beardtongues.

17.     Plaintiff WESTERN RESOURCE ADVOCATES (WRA) is a nonprofit

environmental law and policy organization with offices in six western states, including Colorado

and Utah.  WRA's mission is to protect the West's land, air and water.  Its team of lawyers,

scientists, and economists works to:  1) promote a clean energy future that reduces pollution and

the threat of global warming; 2) restore degraded river systems and encourage urban water

providers to use existing water supplies more efficiently in order to meet human needs while

protecting rivers, streams, and aquifers; and 3) protect public lands across the region from energy

development threats.  WRA is actively engaged in protecting Uinta Basin habitats, wildlife, and

plants — including Graham's and White River beardtongues — against the devastating effects of

oil shale and tar sands development.

18.    Plaintiff WESTERN WATERSHEDS PROJECT (WWP) is a nonprofit environmental conservation group with field offices in Idaho, Montana, Wyoming, Arizona, California, and Oregon.  WWP works to improve public lands management on 250 million acres throughout the West, with a primary focus on the negative impacts of livestock grazing on ecological, biological, cultural, historic, archeological, and scenic resources, as well as on wilderness values, roadless areas, wilderness study areas, and designated wilderness.  WWP's mission includes safeguarding rare and endangered species, such as Graham's and White River beardtongues, which are harmed by domestic livestock grazing and trampling.  WWP's staff has spent many hours of field time in and around the grazing allotments in the area the beardtongues inhabit.

19.    Plaintiffs' members and staff derive scientific, aesthetic, and spiritual benefits from Graham's and White River beardtongues and the ecosystem they inhabit.  Members and staff recreate and pursue educational and scientific pastimes in Graham's and White River beardtongue habitat and in the Uinta Basin ecosystem.  They enjoy viewing and seeking to view the beardtongues and other wildlife in the field.  Members and staff also enjoy studying and photographing the beardtongues.  They have concrete plans to continue these activities.  The educational, scientific, aesthetic, and recreational interests of these organizations' members and staff have been and, unless the Court grants the requested relief, will continue to be adversely affected and irreparably harmed by Defendants' decision to deny ESA protection to Graham's and White River beardtongues.

20.    Plaintiffs have advocated for ESA protections for Graham's and White River beardtongues for many years.  Their actions have included petitioning FWS to list the

beardtongues under the ESA, acting as plaintiffs in litigation seeking ESA protection for the beardtongues, and submitting comments in support of proposed listings and critical habitat designations.

21.     Defendant NOREEN WALSH is sued in her official capacity as Regional Director of the Mountain-Prairie Region of FWS.  The Regional Director is responsible for FWS's activities and decisions affecting the Mountain-Prairie Region, which includes Colorado and Utah.

22.     Defendant SALLY JEWELL is sued in her official capacity as Secretary of Interior (Secretary).  The Secretary is legally charged with administering the ESA, including the review and approval of listing decisions for endangered and threatened species.  See 16 U.S.C. §§ 1532(15), 1533(a)(1).

23.     Defendant UNITED STATES FISH AND WILDLIFE SERVICE is the federal agency within the U.S. Department of Interior responsible for administering the provisions of the ESA with regard to terrestrial plant species, including Graham's and White River beardtongues.

24.     Defendant UNITED STATES DEPARTMENT OF THE INTERIOR is an executive department that oversees FWS and the U.S. Bureau of Land Management (BLM), a signatory to the Conservation Agreement.

## STATUTORY BACKGROUND

25.     Congress enacted the ESA to protect endangered and threatened species and the ecosystems on which those species depend.  16 U.S.C. § 1531(b).

26.     The ESA provides protection only to those species FWS designates as either "endangered" or "threatened."  A species is endangered when it "is in danger of extinction

throughout all or a significant portion of its range." Id. § 1532(6).  A species is threatened if it "is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." Id. § 1532(20).

27.     Under ESA Section 4, FWS must list any species that is threatened or endangered as a result of any one or a combination of the following factors:

(A)     the present or threatened destruction, modification, curtailment of its habitat or range;

(B)     overutilization for commercial, recreational, scientific, or educational purposes;

(C)     disease or predation;

(D)     the inadequacy of existing regulatory mechanisms; or

(E)     other natural or manmade factors affecting its continued existence.

Id. § 1533(a)(1).  FWS must consider both current and future threats to the species and its habitat.  See id. §§ 1532(6), 1532(20), 1533(a)(1).

28.     FWS must make its listing decision "solely on the basis of the best scientific and commercial data available." Id. § 1533(b)(1)(A).

29.     In determining whether to list a species, FWS may "tak[e] into account those efforts, if any, being made by any State or foreign nation, or any political subdivision of a State or foreign nation, to protect such species." Id.

30.     FWS cannot base a decision not to list a species on future or speculative conservation measures not proven to be effective.  See id. § 1533(a)(1)(D) (requiring FWS to consider the adequacy of "existing" regulatory mechanisms), id. § 1533(b)(1)(A) (allowing FWS to take into account efforts "being made" by states and counties).  FWS also cannot base a

decision not to list on conservation measures that are not "regulatory" mechanisms.  See id. § 1533(a)(1)(D), (b)(1)(A).

31.     If FWS determines that listing a species as endangered or threatened is warranted, it must publish a proposed listing in the Federal Register.  Id. § 1533(b)(3)(B)(ii).  Within one year of the proposed listing, FWS must publish in the Federal Register either a final regulation listing the species or a notice that it is withdrawing the proposal, along with the reasons for the withdrawal.  Id. § 1533(b)(6)(A)(i).

32.     If FWS lists a species as threatened or endangered, it must designate critical habitat for that species.  Id. § 1533(a)(3)(A)(i).  Critical habitat includes areas occupied by the species containing "physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection," and areas not occupied by the species that "are essential for the conservation of the species."  Id. § 1532(5)(A).  Conservation means "the use of all methods and procedures which are necessary" to recover species to the point that they no longer need ESA protection.  Id. § 1532(3).

33.     If FWS withdraws a proposed rule, the process ends, and the species is afforded no protection under the ESA.  FWS's withdrawal decision is subject to judicial review.  Id. § 1533(b)(6)(B)(ii).

34.     Once a species is listed, ESA safeguards apply.  Under ESA Section 9, it is illegal for any person to remove or maliciously damage or destroy listed plant species on federal lands. Id. § 1538(a)(2)(B).  Under ESA Section 7, federal agencies cannot engage in or authorize any action that will jeopardize the survival or recovery of threatened or endangered plants or adversely modify their critical habitat.  Id. § 1536(a).  Section 7's requirements apply when

federal agencies are funding, permitting or otherwise authorizing activities by private parties that affect listed species.

35.     The ESA's ultimate goal is to recover listed species to the point that they no longer need ESA protection.  Id. §§ 1531(b)–(c), 1532(3), 1533(f).

## STATEMENT OF FACTS

**I.     Graham's and White River Beardtongues Are Threatened With Extinction as a Result of Fossil Fuel Development and Other Cumulative Threats**

36.     Graham's and White River beardtongues are rare wildflowers that live primarily on oil shale formations in the Uinta Basin of northeastern Utah and northwestern Colorado.  The Uinta Basin's oil shale and tar sand deposits make up part of the Green River Formation, the largest known concentration of oil shale in the world.  This region also contains rich deposits of oil and natural gas.

37.     The Uinta Basin contains a checkerboard of private, state, and federal land. Approximately 50% of the identified Graham's beardtongue population and 60% of the identified White River beardtongue population live on BLM-managed federal land.  The rest of the populations live on state and private lands in Uintah County, Utah and Rio Blanco County, Colorado.

38.     The greatest threat to the beardtongues' survival is energy exploration and development, including oil shale and tar sands mining and traditional oil and gas development.

39.     The Energy Policy Act of 2005 identifies the Green River Formation, including the entire Graham's and White River beardtongues' ranges, as a priority area for oil shale and tar sands development and provides economic incentives for development in this region.  42 U.S.C. § 15927(m)–(n).

40.     Surface strip mining is likely to be the preferred method of oil shale and tar sands development within this region.  Strip mining results in 100% surface disturbance and the complete loss of surface vegetation.

41.     In 2013, BLM opened 360,400 acres in Utah and 26,000 acres in Colorado for oil shale leasing, and 130,000 acres in Utah for tar sands leasing.  Thirty-three percent of the known Graham's beardtongue population and 52% of the known White River beardtongue population live within the area that BLM has opened to oil shale or tar sands leasing in Utah.

42.     Oil shale development also is expected on state and private lands in Utah.  The Utah School and Institutional Trust Lands Administration (SITLA) has sold oil shale leases on state lands that include 23% and 9% of the total known Graham's and White River beardtongue populations, respectively.

43.     The State of Utah has approved one commercial-scale oil shale mine and six exploration mines on state and private lands overlapping Graham's and White River beardtongue habitat.  Two other permits for oil shale mines on private or state lands are pending before the State.

44.     In the final withdrawal decision, FWS estimates that, without additional protection, up to 81% and 91% of the total known populations of Graham's and White River beardtongues, respectively, are vulnerable to direct loss and indirect negative impacts from oil shale and tar sands development.

45.     Graham's and White River beardtongue also are threatened by traditional oil and gas development in Utah and Colorado.  Over the last 20 years, oil and gas production in the Uinta Basin has increased substantially.

46.     FWS expects traditional oil and gas development to increase within beardtongue habitat.  Twenty-seven percent and 12.5% of all known Graham's beardtongue and White River beardtongue plants, respectively, occur within areas that have already been leased by BLM or the State of Utah for traditional oil and gas development.

47.     Oil shale, tar sands, and traditional oil and gas development harm beardtongues in a number of ways.  The plants can be destroyed by surface mining, drill pads, disposal pits, and the infrastructure necessary to support mining and drilling operations, such as roads, transmission lines, and pipelines.

48.     Even where development does not occur directly on top of beardtongues, there may be severe impacts to the plants.  For example, habitat loss and fragmentation from energy development can confine the beardtongues to smaller, more isolated patches of habitat, increasing the chance of extinction.

49.     Surface disturbance from energy development can destroy the beardtongues' pollinators' habitat and disrupt critical connectivity corridors for the pollinators.  Pollinators include bees, wasps, and other flying insects that transfer pollen between plants.

50.     Surface disturbance and increased road traffic from energy development also increase airborne dust, which can cause plant dehydration and suffocation and reduce growth and reproduction.

51.     Energy development also increases the spread of invasive weed species, such as cheatgrass.  Invasive weeds threaten the beardtongues by increasing wildfire frequency and intensity, outcompeting beardtongues for space and resources, and altering the pollinator community.

52.     For these reasons and others, energy exploration and development threatens Graham's and White River beardtongues with extinction.  Additionally, the cumulative impacts of increased energy development, livestock grazing and trampling, small population sizes, invasive weeds, and climate change pose a threat to these species.

53.     Livestock grazing occurs throughout the Graham's and White River beardtongues' ranges.  BLM grazing allotments overlap more than half of the known Graham's beardtongue population and more than 60% of the known White River beardtongue population. Livestock graze on and trample beardtongue plants.

54.     At the time FWS made its withdrawal decision, there were only 24 known Graham's beardtongue populations and 8 known White River beardtongue populations.  Many of the known beardtongue populations contain fewer than 150 known plants, making them more prone to extinction from random harmful events, such as wildfires.

55.     Climate change is expected to increase drought intensity and frequency, and increase average temperatures in the beardtongues' habitat, leading to decreases in populations. Because the species live only on oil shale soils, they are restricted in their abilities to shift their ranges in response to climate change.

II.     **Graham's and White River Beardtongue Listing History**

  A.     **After Substantial Delay and Numerous Lawsuits, FWS Proposed Listing the Beardtongues as Threatened Species**

56.     From 1980 to 2004, FWS included Graham's beardtongue on its list of candidate species that should be listed under the ESA.  Although FWS recognized the threats to Graham's beardtongue were "imminent" and of a "high magnitude," FWS did not propose listing until

14

conservation groups, including many Plaintiffs, sued the agency in 2003 in this Court.  As part of a settlement, FWS agreed to propose listing Graham's beardtongue by January 9, 2006.

57.     On January 19, 2006, FWS proposed to list Graham's beardtongue as a threatened species and to designate critical habitat.  71 Fed. Reg. 3,158 (Jan. 19, 2006).  Less than a year later, FWS reversed its decision and withdrew the proposed rule.  71 Fed. Reg. 76,024 (Dec. 19, 2006).  FWS relied heavily on BLM's claims that it would adequately protect Graham's beardtongue from energy development on federal lands.

58.     Plaintiffs Center for Native Ecosystems (now Rocky Mountain Wild), SUWA, UNPS, and others sued to challenge the withdrawal decision in this Court.  This Court vacated the decision and reinstated the proposed rule.  Ctr. for Native Ecosystems, 795 F. Supp. 2d at 1210.  The Court held that FWS:  (1) failed to consider the cumulative threats to the species; (2) failed to adequately consider the best available science on threats from oil and gas development, grazing, and other threats; (3) improperly relied on future conservation measures to protect the species, such as BLM's promises to protect the species through future land use planning and oil and gas leasing decisions; and (4) failed to explain how existing oil and gas lease provisions adequately reduced threats to the species.  Id. at 1206–10.  The Court ordered FWS to issue a new finding.  Id. at 1210.

59.     White River beardtongue was designated as a candidate species warranting listing in 1983.  Although FWS repeatedly found that White River beardtongue deserved protection under the ESA, it did not propose listing until conservation groups, including the Center, sued.  In a settlement agreement reached in 2011, FWS agreed to make listing decisions for White River beardtongue and other candidates.

60.     On August 6, 2013, FWS proposed to list both beardtongues as threatened species.  78 Fed. Reg. 47,590 (Aug. 6, 2013).  FWS found that Graham's and White River beardtongues are threatened by oil shale, tar sands, and traditional oil and gas exploration and development.  Additionally, FWS found that both species are threatened by the combined impacts of energy development, invasive weeds, livestock grazing, small population sizes, and climate change.

**B.      FWS Identified Critical Habitat Essential to the Conservation of the Beardtongues**

61.     Concurrent with the proposed listing rules, FWS proposed to designate 67,959 acres as Graham's beardtongue critical habitat and 14,914 acres as White River beardtongue critical habitat.  78 Fed. Reg. 47,832 (Aug. 6, 2013).  The proposed critical habitat included approximately 7,027 acres of overlap between the two species, for a total of 75,846 acres.

62.     As required by the ESA, FWS drew the boundaries of the proposed critical habitat to include the physical or biological features essential to the conservation of the species.  See 16 U.S.C. § 1532(5)(A)(i).

63.     FWS identified the habitat within a 1,640-foot radius around White River beardtongue plants and a 2,297-foot radius around Graham's beardtongue plants as a physical or biological feature essential to the conservation of the species.  FWS recognized the habitat within these buffers is necessary to conserve both the pollinators essential for beardtongue reproduction and the intact native plant communities on which the pollinators depend.  FWS also acknowledged that this habitat would protect beardtongues from invasive weed encroachment and other threats.

64.     FWS also identified intact soils with surface disturbance at or below current levels — both within occupied habitat and within nearby plant communities — as a physical or biological feature essential to the conservation of both species.

**C.     FWS Withdraws the Proposed Listing Rule Based on the 2014 Conservation Agreement**

65.     FWS published its withdrawal of the proposed listing and critical habitat rules on August 6, 2014.  FWS based its decision on a Conservation Agreement that it developed with BLM, SITLA, Uintah County, Rio Blanco County, the energy industry, and other Utah state entities.

66.     FWS concludes that actions proposed to be taken under the Conservation Agreement adequately reduce current and future threats to both beardtongue species such that listing no longer is necessary.

67.     The Conservation Agreement expires after 15 years.

68.     The Conservation Agreement terminates automatically if FWS lists either species. Non-federal parties, including SITLA, refused to sign the Agreement unless it included a provision terminating the Agreement upon listing of either beardtongue.

69.     The signatories to the Conservation Agreement agree to form a "conservation team" within six months, comprised of up to one member from each signatory.  The conservation team is charged with overseeing and implementing the Conservation Agreement.

70.     The Conservation Agreement identifies "conservation areas" that encompass approximately 44,373 acres.  This amounts to less than 60% of the total acreage FWS determined was essential to the conservation of both species in its critical habitat proposal.

71.     The conservation areas are divided between five units.  Each unit contains a mix of BLM, state, and private lands.

72.     BLM, SITLA, and Uintah County plan to limit new surface disturbance, such as that from drilling pads or roads, to 5% of remaining undisturbed land area per landowner per unit in Graham's beardtongue conservation areas and 2.5% of remaining undisturbed land area per landowner per unit in White River beardtongue conservation areas (hereinafter "surface disturbance caps").

73.     BLM, SITLA, and Uintah County also intend to avoid ground-disturbing activities within 300 feet of beardtongue plants in conservation areas (hereinafter "300-foot buffers") in some cases.  BLM agrees to implement 300-foot buffers on federal lands outside of conservation areas.

III.    **FWS Relies on Future, Non-Regulatory Conservation Measures Found in the 2014 Conservation Agreement to Reduce or Eliminate Identified Threats**

74.     FWS relies on BLM's, SITLA's, and Uintah County's nonbinding plans to impose surface disturbance caps and 300-foot buffers within their jurisdictions within three months of signing the Conservation Agreement.

75.     BLM plans to implement these two conservation measures initially through non-regulatory mechanisms, such as permits and budgets.  Although BLM eventually plans to incorporate these conservation measures into its RMPs, BLM has not committed to a date certain for completing these RMP amendments.  As of the drafting of this complaint, BLM has not proposed to amend any RMPs to include the terms of the Conservation Agreement.

76.     FWS relies heavily on the surface disturbance caps and the 300-foot buffers despite the fact that the Conservation Agreement identifies numerous future actions that will be

undertaken by the conservation team to determine whether and how these two conservation measures will be implemented.

77.     For example, within one year of signing the Conservation Agreement, the conservation team plans to revisit the surface disturbance caps.  The conservation team intends to first calculate the amount of existing surface disturbance within the conservation areas.  Once it has completed that analysis, the conservation team may adjust the surface disturbance caps upward — but not downward — to allow for flexibility in siting projects.

78.     The conservation team also plans to determine in the future how it will track surface disturbance on state, private, and federal lands to ensure that disturbance remains below the surface disturbance caps.  The Conservation Agreement does not set a timeframe for this decision.

79.     Within one year of signing the Conservation Agreement, the conservation team also plans to develop a standardized procedure to mitigate development that will be allowed within the 300-foot buffers under certain undefined circumstances.

80.     FWS relies on additional future, speculative conservation measures in the Conservation Agreement to address threats from livestock grazing and trampling, invasive weeds, and climate change.

81.     Within one year of signing the Conservation Agreement, BLM intends to develop a livestock grazing plan that will provide for monitoring and mitigation of livestock impacts. FWS relies on BLM's future livestock grazing plan to address the threat of grazing and trampling.

82.     Within one year of signing the Conservation Agreement, the conservation team plans to develop, fund, and implement by consensus an invasive weed management plan to detect invasions and identify treatments.  FWS relies on the conservation team's future weed management plan to reduce the invasive weed threat.

83.     FWS also relies on the conservation team's future plans to address the threat of climate change.  If funding permits, the conservation team may install weather monitoring equipment to study climate change effects on the beardtongues.  No deadline for this conservation measure is provided.

84.     The Conservation Agreement contains no provisions that govern in the event that the conservation team is unable to reach agreement with respect to future plans or other implementation issues.

85.     The Conservation Agreement is terminable at will by any party.  There are no penalties or other consequences if a party violates the Conservation Agreement.

IV.     **FWS's Claim that the 2014 Conservation Agreement Will Adequately Reduce the Threats to the Beardtongues is Not Based on the Best Available Science and Lacks a Reasoned Basis**

A.      **The Conservation Agreement Does Not Adequately Protect the Beardtongues Because Foreseeable Threats to the Beardtongues Will Persist Beyond 15 Years**

86.     In the withdrawal decision, FWS concludes that the 15-year Conservation Agreement is sufficient to ameliorate threats to the beardtongues for the foreseeable future.

87.     The best available scientific and commercial information indicates that energy development, including oil shale and traditional oil and gas development, poses a threat to the

species within the next 15 years and beyond. For example, oil shale developments are expected to persist for at least 30 years.

88.     On information and belief, FWS limited the Conservation Agreement to 15 years to appease signatories to the agreement, not because it was the term that would adequately protect the beardtongues for the foreseeable future.

89.     The non-federal signatories, including SITLA and Uintah County, refused to sign an agreement lasting longer than 15 years. A January 2014 PowerPoint presentation by SITLA's Associate Director and Chief Legal Counsel, John Andrews, to SITLA's Board of Trustees indicated that a "cardinal principle" of any Conservation Agreement would be that it last no more than 15 years. The text of the PowerPoint presentation is reproduced in the minutes for the January 23, 2014 SITLA Board meeting, available at http://www.utah.gov/pmn/files/115069.pdf.

90.     FWS relies on the fact that the Conservation Agreement may be renewed after 15 years. However, FWS fails to consider evidence suggesting that renewal is unlikely. For example, SITLA communicated to FWS that it was unwilling to indicate any intent to renew in the Conservation Agreement. The Enefit American Oil Company (Enefit), an oil shale developer, commented on a Conservation Agreement draft that the company has "no intent beyond 15 years" to participate in such an agreement.

**B.     FWS Fails to Protect Beardtongue Habitat Threatened By Oil Shale Development in the Next 15 Years**

91.     As of March 2014, FWS was aware of numerous planned and ongoing projects for oil shale development on state and private lands in Utah, including one commercial-scale development. These include projects planned by Enefit, Red Leaf Resources, TOMCO Energy, and Ambre Energy.

92.     The Enefit project area includes approximately 15% of the known Graham's beardtongue population and 24% of the known White River beardtongue population.  The areas owned or leased by TOMCO Energy and Red Leaf Resources include approximately 15% and 4%, respectively, of the known Graham's beardtongue population. The area Ambre Energy plans to explore for oil shale includes more than 8% of the known White River beardtongue population.

93.     The areas owned or leased by Enefit, Red Leaf Resources, and TOMCO Energy and the lands being explored by Ambre Energy also contain habitat FWS deemed essential to the conservation of the species in the critical habitat proposal.

94.     In the withdrawal decision, FWS recognizes that, if implemented, these oil shale projects would reduce the viability of both beardtongue species.  In the proposed listing rule, FWS concluded that development of the Enefit and Red Leaf projects alone would have substantial impacts and would decrease the viability of both species.

95.     FWS depends on the Conservation Agreement to protect the beardtongues from the oil shale threat, including the threats from the Enefit, TOMCO Energy, Red Leaf Resources, and Ambre Energy projects.  Yet, FWS excluded from the conservation area boundaries lands owned, leased, or being explored by these entities.  In particular, FWS excluded lands where energy exploration and development is anticipated during the Conservation Agreement's 15-year term.

96.     FWS initially identified "proposed conservation areas" encompassing fewer acres of habitat than FWS previously had proposed as critical habitat, but at least 19,000 acres more than it ultimately designated as conservation areas.

22

97.     FWS excluded more than 15,000 acres of proposed conservation areas on private lands from the final designation due to anticipated energy development.

98.     For example, FWS excluded the private lands that Enefit plans to develop initially.  The excluded lands within the Enefit project area are home to a Graham's beardtongue population that provides important connectivity between populations.  They also are home to a White River beardtongue "core population area."

99.     FWS designated more than 3,300 acres of SITLA and private lands as "interim conservation areas."  Interim conservation areas may be converted to non-conservation areas as soon as energy development is approved and therefore are subject to 100% surface disturbance at any time.

100.    The interim areas include lands owned, leased, or being explored by Red Leaf Resources, TOMCO Energy, and Ambre Energy.

101.    FWS also identified more than 1,400 acres of state and private land as "core population areas" for White River beardtongue.  Approximately two-thirds of this habitat was excluded from the conservation areas or designated as interim conservation areas due to active or anticipated energy development.

102.    On information and belief, FWS excluded these state and private lands from the conservation areas at the insistence of SITLA, Uintah County, and oil shale developers.

103.    According to John Andrews's January 2014 PowerPoint presentation to SITLA's Board of Trustees, FWS identified core conservation areas for the beardtongues on BLM, SITLA, and private lands.  In response, SITLA and the oil shale miners developed "no zones" that they refused to include within conservation areas and where 100% surface disturbance

would be allowed.  The "no zones" included state oil shale leases where development is anticipated within the 15-year term of the Conservation Agreement.  In exchange, the parties would agree to "set aside . . . some unleased oil shale tracts" for 15 years.

104.    The SITLA PowerPoint presentation indicates that Uintah County's plan was to ask FWS to withdrawal the listing based on voluntary conservation of areas "outside near-term development" in exchange for allowing the Enefit, TOMCO Energy, and Red Leaf Resources projects to proceed.

105.    During the January 2014 SITLA Board meeting, Mr. Andrews described SITLA's vision for the Conservation Agreement:  "The idea would be to commit to some level of conservation on unimportant lands and ask the Service to withdraw the proposed listings." Presentation by John Andrews, SITLA Associate Director and Chief Legal Counsel, to SITLA Board of Trustees, 1:44:22–:33 (Jan. 23, 2014), available at http://www.utah.gov/pmn/files/archive/91361.mp3.  He further explained, "We're trying to find the areas that our oil shale lessees will be mining in the next 15 years . . . and totally free those from any [restrictions]."  Id. at 1:47:47–48:02.  Mr. Andrews was involved in negotiating the Conservation Agreement on behalf of SITLA.

106.    At an April 2014 SITLA Board retreat, Mr. Andrews stated:  "So that's the basic concept, is you've got a 15 year agreement that's going to buy for all of our miners the ability to strip mine and destroy any penstemon that are located on those sites in exchange for some conservation" on lands "that wouldn't be disturbed" anyway.  Presentation by John Andrews, SITLA Associate Director and Chief Legal Counsel, to SITLA Board of Trustees, 1:21:30–:59 (Apr. 17, 2014), available at http://www.utah.gov/pmn/files/archive/101711.mp3.

107.    On information and belief, SITLA, Uintah County, and oil shale companies communicated their "no zones" to FWS.  FWS excluded these "no zones" from the conservation areas.

108.    For example, Enefit identified for FWS all of the lands that the company would not agree to include within the conservation areas because doing so could affect its development plans.  FWS agreed to exclude the specified lands from the final conservation areas.

109.    Enefit also informed FWS that it was unwilling to agree to long-term protections for any lands that it was willing to include within the conservation areas.  FWS agreed to limit the designated conservation areas to a term of 15 years.

110.    FWS provides no justification for denying protections on state and private lands that it previously determined are threatened by oil shale mining over the next 15 years.

111.    FWS fails to analyze the effect of excluding state and private lands containing a significant number of beardtongue plants and habitat essential to their conservation from the conservation areas.

### C.    FWS's Claim that the Surface Disturbance Caps Adequately Protect the Beardtongues is Unsupported and Conflicts with the Best Available Science

112.    In the withdrawal decision, FWS concludes that limiting surface disturbance to an additional 5% and 2.5% of Graham's and White River beardtongue conservation area land, respectively, adequately reduces threats from energy development.

113.    FWS provides no basis for how it selected 5% and 2.5% as the surface disturbance cap values, other than to state that the values are less than the maximum surface disturbance permissible under Utah oil and gas regulations.  FWS provides no explanation why the cap values are low enough to adequately protect the species from energy development.

114.     FWS initially proposed prohibiting any surface disturbance in conservation

areas.  On information and belief, FWS decided to allow some surface disturbance to

accommodate new development on existing oil and gas leases.  FWS also recognized that

allowing some surface disturbance would allow for new oil and gas development in conservation

areas.

115.     FWS did not know the amount of existing surface disturbance within the

conservation areas when it withdrew the proposed rules.  Therefore, FWS could not know the

total disturbance levels once an additional 2.5% or 5% of disturbance occurs.  And absent this

knowledge, FWS could not determine whether the surface disturbance caps adequately reduce

the energy threat.

116.     FWS failed to consider whether BLM or SITLA will be able to enforce buffers or

disturbance caps on existing energy leases within the conservation areas.

**D.     FWS's Claim that the 300-Foot Buffer Adequately Protects the Beardtongues is Unsupported and Conflicts with the Best Available Science**

117.     In the proposed rules, FWS acknowledged that while a 300-foot buffer may

prevent direct loss of plants, it is inadequate to protect beardtongues against indirect impacts of

energy development.

118.     In the final withdrawal decision, FWS concludes the 300-foot buffer is adequate

to protect the beardtongues from the indirect impacts of energy development.  FWS provides no

new information to support its changed conclusion.

119.     The 300-foot radius around Graham's and White River beardtongue plants is just

over 13% and 18%, respectively, of the radii that FWS previously identified as necessary to

protect pollinator habitat essential to the conservation of the beardtongues.  FWS never explains

how protecting such a small percentage of essential pollinator habitat is sufficient to support pollinators and connectivity between populations.

120.     FWS recognizes airborne dust can have harmful impacts to the beardtongues up to 6,500 feet away from ground disturbance.  FWS fails to explain how a buffer that is less than 5% of that distance adequately protects the beardtongues from negative effects of dust.

121.     FWS chose the 300-foot buffer to balance protection of the species with energy development.

122.     FWS relies on mitigation measures to adequately protect the beardtongues when development is authorized within the 300-foot buffer.  FWS had not determined what those mitigation measures will be at the time it withdrew the proposed listings.

## V.     FWS's Policy for Evaluation of Conservation Efforts When Making Listing Decisions Does Not Justify Its Reliance on the Conservation Agreement

123.     FWS concludes that it may consider the Conservation Agreement in the withdrawal decision because the Agreement meets the criteria established in FWS's Policy for Evaluation of Conservation Efforts When Making Listing Decisions (PECE).  See July 25, 2014 PECE Evaluation for the Graham's and White River Beardtongues 2014 Conservation Agreement and Strategy ("PECE Evaluation").

124.     Prior to 2003, FWS suffered a number of litigation defeats based on its reliance on future, voluntary conservation measures in listing decisions.  See, e.g., Fed'n of Fly Fishers v. Daley, 131 F. Supp. 2d 1158, 1165 (N.D. Cal. 2000); Or. Natural Res. Council v. Daley, 6 F. Supp. 2d 1139, 1154 (D. Or. 1998); Save Our Springs v. Babbitt, 27 F. Supp. 2d 739, 747–48 (W.D. Tex. 1997).

125.     In response to those decisions, FWS adopted the PECE in 2003.  68 Fed. Reg. 15,100, 15,106 (Mar. 28, 2003).  The PECE is not codified in the Code of Federal Regulations.

126.     The PECE establishes the minimum criteria that FWS thinks a formalized conservation effort, such as a conservation agreement, must satisfy for FWS to consider the effort in a listing decision.  FWS recognizes in the PECE that it "may not rely on speculative promises of future action when making listing decisions."  Id.  But FWS asserts that it may "consider" formalized conservation efforts that have yet to be implemented or shown to be effective if it determines using the PECE criteria that there is "sufficient certainty" that such measures will be implemented and effective.  Id. at 15,113.  According to FWS, conservation efforts that do not meet the PECE criteria may not be considered in a listing decision.  Id. at 15,115.

127.     In this case, FWS violated the ESA by using PECE to justify reliance on conservation measures that are not "existing" or "being made" as well as BLM's promise to impose conservation efforts through non-regulatory mechanisms.  See supra Part III.

128.     On information and belief, FWS made its decision to withdrawal the proposed listings based on the Conservation Agreement prior to completing its PECE Evaluation.  Therefore, it was a foregone conclusion that the PECE Evaluation would conclude that the Conservation Agreement was sufficiently certain to be implemented and effective.

129.     FWS's PECE Evaluation also is inconsistent with the PECE and lacks a reasoned basis.  Accordingly, FWS's own policy prohibited it from considering the Conservation Agreement in its listing decision.

**A.** **FWS's Claim that the Conservation Agreement is Certain to be Implemented Is Inconsistent with the PECE and Lacks a Reasoned Basis**

130.    In the PECE Evaluation, FWS concludes that the Conservation Agreement is sufficiently certain to be implemented such that FWS may consider it in the final listing decision.

131.    One of the PECE criteria that FWS considers is whether "[r]egulatory mechanisms (e.g., laws, regulations, ordinances) necessary to implement the conservation effort are in place." Id. at 15,115.

132.    The PECE Evaluation recognizes that the conservation actions in the Conservation Agreement, including the establishment of the conservation areas, the surface disturbance caps, and the 300-foot buffers, were not in place at the time of FWS's withdrawal decision.  FWS instead concludes that such measures "are or will be in place."  PECE Evaluation at 22 (emphasis added).

133.    FWS also concludes that there is a high degree of certainty that the conservation agreement will be implemented because its signatories have a track record of implementing conservation measures for the beardtongues since 2007.

134.    FWS relies on the signatories' implementation of a voluntary 2007 Conservation Agreement for Graham's beardtongue.  SITLA and Uintah County never signed the agreement.

135.    The 2007 Conservation Agreement was only partially implemented.  In fact, the signatories failed to implement a majority of its conservation measures.

136.    FWS offers no support for its conclusion that SITLA has a proven track record of protecting the species.  FWS does not identify any conservation actions taken by SITLA to protect Graham's beardtongue, White River beardtongue, or any other rare or listed plant species found on SITLA lands.

137.    FWS relies on BLM's commitment to 300-foot buffers around Graham's beardtongue plants in the Record of Decision (ROD) for the Vernal RMP.  However, BLM only agreed to 300-foot buffers in the Vernal ROD to compensate for "mistakenly overlook[ing]" conservation groups' proposal to designate Graham's beardtongue habitat in Utah as a protected Area of Critical Environmental Concern.  BLM, Vernal Field Office, Record of Decision and Approved Resource Management Plan 18 (Oct. 2008), available at http://www.blm.gov/style/medialib/blm/ut/vernal_fo/planning/rod_approved_rmp.Par.12251.File .dat/VernalFinalPlan.pdf.

138.    Furthermore, despite its commitment to a 300-foot buffer in the Vernal ROD, BLM issued an environmental assessment in April 2014 for an oil shale project that would include drilling exploratory wells within 300 feet of Graham's beardtongue plants.  BLM requested FWS's concurrence on the proposal on August 4, 2014 — less than two weeks after the parties finalized the Conservation Agreement.

139.    FWS also determines the Conservation Agreement is reasonably certain to be implemented because necessary funding is sufficiently certain, as required under the PECE.  See 68 Fed. Reg. at 15,115.  The PECE states "at least 1 year of funding should be assured, and [FWS] should have documentation that demonstrates a commitment to obtain future funding." Id. at 15,108.

140.    One year of funding to implement the Conservation Agreement's measures was not assured at the time FWS conducted its PECE Evaluation.  FWS also had no documentation from any signatory demonstrating a commitment to obtain future funding to implement the

Conservation Agreement.  In fact, the Conservation Agreement expressly disclaims any

mandatory funding requirements.

141.    FWS relies on in-kind services from Uintah County, SITLA, and BLM to:

establish and manage the conservation areas; conduct rangewide monitoring, livestock

monitoring, species surveying, demographic monitoring, genetic testing, seed collection, and

invasive weed management; and install a weather station.  FWS offers no evidence that the

parties have sufficient funding or available staff to implement these measures.

142.    As of the Conservation Agreement's signing, FWS had not yet determined the

cost for many of the surveys, habitat inventories, or scientific research.

**B.      FWS's Claim that the Conservation Agreement Is Certain to Be Effective Is
Inconsistent with the PECE and Lacks a Reasoned Basis**

143.    In the PECE Evaluation, FWS concludes that there is a high level of certainty that

the Conservation Agreement will be effective at eliminating or reducing the threats to the

beardtongues.

144.    The PECE Evaluation contains no explanation for how the Conservation

Agreement will be effective at reducing the energy development threat when it allows oil shale

development to proceed in beardtongue habitat on state and private lands during the life of the

agreement.

145.    FWS provides no evidence that the surface disturbance caps of 2.5% and 5% for

White River and Graham's beardtongue, respectively, are likely to be effective at protecting the

species from the energy development threat.

146.    FWS provides no evidence that a 300-foot buffer is likely to be effective at

protecting the beardtongues from indirect energy development threats.

147.    FWS provides no evidence that undetermined conservation measures addressing livestock grazing, invasive weeds, and climate change are likely to be effective at protecting the beardtongues.

**FIRST CAUSE OF ACTION**
**(Violation of the Endangered Species Act and Administrative Procedure Act — Reliance on Future, Non-Regulatory Conservation Measures)**

148.    Paragraphs 1–147 are incorporated herein by reference.

149.    Under ESA Section 4, FWS has a mandatory duty to list Graham's and White River beardtongues if they are endangered or threatened throughout all or a significant portion of their ranges due to any of the five listing factors, standing alone or in combination.  16 U.S.C. §§ 1532(6), 1532(20), 1533(a)(1).

150.    One of the listing factors FWS must consider is "the inadequacy of existing regulatory mechanisms."  Id. § 1533(a)(1)(D).  In determining whether to list a species, FWS may also consider "efforts . . . being made" to protect the species by States, political subdivisions of the States, or foreign nations.  Id. § 1533(b)(1)(A).  FWS may not rely on future, speculative conservation measures or non-regulatory mechanisms to protect the species from identified threats.  See id. § 1533(a)(1)(D), (b)(1)(A).

151.    In this case, FWS relies on future, undefined conservation measures found in the Conservation Agreement that were not "existing" or "being made" at the time FWS made the withdrawal decision.

152.    FWS also relies on BLM's promise to implement the Conservation Agreement through non-regulatory mechanisms to justify FWS's decision to withdrawal the proposed rules.

153.    To the extent that FWS is relying on PECE and its PECE Evaluation to justify its reliance on conservation measures that are not "existing" or "being made" or on non-regulatory mechanisms, its actions are inconsistent with the plain language of the ESA.

154.    Furthermore, FWS's conclusions in its PECE Evaluation that the Conservation Agreement is likely to be implemented and effective constitute a predetermined outcome and are unsupported, arbitrary, and inconsistent with FWS's own PECE.

155.    FWS's reliance on future, non-regulatory conservation measures in its decision to withdrawal the proposed listings and critical habitat designations for Graham's and White River beardtongues violates its nondiscretionary duties under ESA Section 4, id. § 1533, and is arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law under the APA, 5 U.S.C. § 706.

### SECOND CAUSE OF ACTION
**(Violation of the Endangered Species Act and Administrative Procedure Act — Failure to Rely on the Best Available Science and Lack of a Reasoned Basis for Withdrawal Decision)**

156.    Paragraphs 1–155 are incorporated herein by reference.

157.    ESA Section 4 requires FWS to list a species as endangered if it "is in danger of extinction throughout all or a significant portion of its range" and to list a species as threatened if it is "likely to become an endangered species within the foreseeable future within all or a significant portion of its range."  16 U.S.C. § 1532(6), (20).  Accordingly, FWS must consider whether any of the five listing factors pose a threat to the species now or in the "foreseeable future."  Id. § 1532(20); see also id. §§ 1532(6), 1533(a)(1).

158.    FWS must make its listing decision "solely on the basis of the best scientific and commercial data available."  Id. § 1533(b)(1)(A).

159.    FWS concludes that Graham's and White River beardtongues are not likely to become endangered species within the foreseeable future because the 15-year Conservation Agreement will protect the species from future threats.  But FWS fails to explain how the Conservation Agreement will adequately protect the beardtongues from threats that the best scientific and commercial data available show will last beyond 15 years.

160.    FWS also disregards the best available scientific and commercial data showing that the Conservation Agreement does not adequately protect the beardtongues from the threat of energy exploration and development or from other cumulative threats.  FWS ignores its own findings and fails to provide a rational explanation for its shift in position with respect to the adequacy of conservation measures or for its conclusions that future, undefined conservation measures adequately protect the beardtongues.

161.    FWS also improperly bases its listing decision on political considerations Congress did not intend it to consider.

162.    FWS's failure to consider reasonably foreseeable future threats and failure to rely on the best scientific and commercial data available in its decision to withdrawal the proposed listings and critical habitat designations for Graham's and White River beardtongues violates its nondiscretionary duties under Section 4 of the ESA, id. § 1533, and is arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law under the APA, 5 U.S.C. § 706.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs respectfully request that the Court enter judgment providing the following relief:

163.    Declare that Defendants have violated the ESA and APA by withdrawing the proposed rules to list Graham's beardtongue and White River beardtongue as threatened species and to designate critical habitat for both species;

164.    Vacate and remand the decision withdrawing the proposed rules to list as threatened species and designate critical habitat for Graham's and White River beardtongues;

165.    Reinstate the proposals to list the beardtongues as threatened species and designate critical habitat;

166.    Order Defendants to issue a new rulemaking and new findings on Graham's and White River beardtongues, and new critical habitat determinations within 60 days;

167.    Award Plaintiffs costs, including reasonable attorney's fees and expert witness fees; and

168.    Grant Plaintiffs such additional and further relief as the Court may deem just and proper.

Respectfully submitted on March 26, 2015.


 /s/Robin Cooley
Robin Cooley
Christopher Eaton
EARTHJUSTICE
633 17th Street, Suite 1600
Denver, CO 80202
Tel: (303) 623-9466
Fax: (303) 623-8083
rcooley@earthjustice.org
ceaton@earthjustice.org

Attorneys for Plaintiffs